UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMANDA COWETTE, | ) | 1:19-CR-00026-LEW |
| | ) | |
| Defendant | ) | |

# DECISION AND ORDER ON
# <u>DEFENDANT'S MOTION TO SUPPRESS</u>

On February 14, 2019, the Defendant, Amanda Cowette, was charged with (1) conspiracy to distribute and possession with intent to distribute 400 grams or more of fentanyl (a Schedule II controlled substance), in violation of 21 U.S.C. §§ 846, 841(a) and 841(b)(1)(A); (2) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i), and aiding and abetting such conduct in violation of 18 U.S.C. § 2; (3) knowing possession with the intent to distribute 40 grams or more of a mixture or substance containing fentanyl, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and (4) maintaining drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2. Indictment (ECF No. 1). Cowette now moves to suppress statements she made to law enforcement on July 16, 2018 and July 17, 2018. Mot. Suppress 1 (ECF No. 36). A hearing on the motion was held on August 5, 2019. After careful consideration of the evidence and the arguments of counsel, Defendant's Motion to Suppress (ECF No. 36) is **DENIED**.

## BACKGROUND

On July 12, 2018, officers from the Somerset County Sheriff's Office executed a drug search warrant on the person and vehicle of Nicholas Culver based on information Mr. Culver was trafficking Fentanyl in and around Somerset County. Def.'s Ex. 1 ("Ex. 1"), 4 (ECF No. 36-2, #96); Def.'s Ex. 2 ("Ex. 2"), 1 (ECF No. 36-3, #109). Following this search, Culver was arrested and then charged with aggravated trafficking in a scheduled drug and possession of scheduled drugs. Ex. 1 at 8; Ex. 2 at 3.

As part of their ongoing investigation into Culver's drug trafficking, law enforcement officers executed a drug search warrant at the residence of the Defendant, Amanda Cowette, on July 16, 2018. Ex. 1 at 10; Ex. 2 at 5. Officers suspected Cowette was Mr. Culver's girlfriend. Ex. 1 at 5; Ex. 2 at 1.

Upon arrival at Cowette's residence, law enforcement officers notified Cowette that they had a search warrant and provided her with a copy of the warrant. Ex. 1 at 10. Cowette had been standing outside her residence speaking with Corporal Joseph Jackson of the Somerset County Sheriff's Office regarding her reports that she had observed men in the trees around her residence. Ex. 1 at 10; Ex. 2 at 5. Law enforcement officers were unable to locate any trespassers and officers suspected she "was basically 'seeing things that were not there,' due to the drugs that she may have ingested." Ex. 2 at 5. Nevertheless, other than unsubstantiated claims of men on her property, officers reported she was "coherent and walked, talked, and acted in a normal manner." Ex. 2 at 5.

One of the responding officers, Lieutenant Gottardi, requested that Cowette sit in his unmarked police vehicle so they could speak. Ex. 2 at 5. Cowette was handcuffed at

the time. Def.'s Ex. 4 ("Ex. 4") (ECF No. 40). After confirming that Cowette did not have anything hidden on her person, Lieutenant Gottardi read her *Miranda* rights from a prepared card. Ex. 2 at 5; Ex. 4 at 2:40-3:30. When Lieutenant Gottardi asked Cowette if she wished to speak with him, Cowette responded while shrugging her shoulders: "I guess I should probably wait until I have a lawyer, that sounds like the best idea, I don't – I've never been in Court, never been in trouble, I don't – … I guess not, I guess I'll wait until I have a lawyer."[1] Ex. 2 at 5-6; Ex. 4 at 3:35-3:52. Lieutenant Gottardi did not question her further, but did explain what would be taking place at her residence as a result of the search warrant. Ex. 2 at 6. While waiting in the vehicle, Cowette once again reported seeing

---

[1] In full, the exchange proceeded as follows:

> **Lt. Gottardi:** And if you decide to answer any question now, with or without a lawyer present, you have a right to stop answering at any time until you can talk to a lawyer. Do you understand that?
>
> **Cowette:** I guess my best bet would probably be to not talk until I have a lawyer—.
>
> **Lt. Gottardi:** Well no but do you understand that?
>
> **Cowette:** Yes.
>
> **Lt. Gottardi:** Okay so basically what your rights are is if you want to say something that's fine, if you want to answer one thing and not another that's fine, nobody's gonna make you say anything you don't want to say, okay? If you don't want to say anything you don't have to say anything, okay? So do you understand all of that?
>
> **Cowette:** Yes.
>
> **Lt. Gottardi:** So now having all those rights, as I just explained, in your mind, do you wish to speak with me at this time[?]
>
> **Cowette:** I mean, I guess I should probably wait until I have a lawyer, that sounds like the best idea, I don't—I've never been in court I've never been in trouble, I don't—.
>
> **Lt. Gottardi:** Okay well I'm asking you that's up to you, that's up to you. Uh, do you want to answer any questions at this time?
>
> **Cowette:** I guess not, I guess I'll wait until I have a lawyer.
>
> **Lt. Gottardi:** Okay great. So what's gonna happen—that's fine. That's your right, and— and that's super.

Gov't Ex. 4T; Ex. 4, 3:03-3:56.

"homeless people in the trees." Ex. 2 at 6; Def.'s Ex. 5 ("Ex. 5"), 0:53-1:24 (ECF No. 40). Lieutenant Gottardi was unable to locate any people. Ex. 2 at 6; Ex. 5 at 2:20-2:22. Cowette denied recent drug use and indicated that she had not taken any medications other than ZQuil to help her sleep the previous night. Ex. 2 at 6; Ex. 5 at 1:27-1:29, 3:12-3:23.

Law enforcement officers entered Cowette's residence to execute the warrant while Lieutenant Gottardi and Cowette stood outside the home. Ex. 1 at 10-11; Ex. 2 at 6. Once again, Cowette reported seeing men in the woods, but Lieutenant Gottardi was unable to see any men. Ex. 2 at 6. When Lieutenant Gottardi repeated his concerns regarding Cowette's health, she responded that she "did not feel affected by what she had taken." Ex. 2 at 6. Inside the residence, officers found two safes. Ex. 1 at 11; Ex. 2 at 6. In response to Lieutenant Gottardi's request, Cowette provided the combination to the safes. Ex. 1 at 11; Ex. 2 at 6.

A few minutes after providing the combinations, Cowette spontaneously commented that a bag of Fentanyl in her top drawer was hers. Ex. 2 at 6. Lieutenant Gottardi reminded her of what he had interpreted as her previous request to not talk. Ex. 2 at 6. Cowette then indicated "she would talk now." Ex. 2 at 6. Lieutenant Gottardi advised Cowette to think about her request to talk and indicated that he would be willing to talk with her later if she chose to speak with him. Ex. 2 at 6. In an effort to ensure Cowette "knew what she was talking about," Lieutenant Gottardi also asked Cowette to confirm her name and date of birth – "which she did rapidly and correctly" – and then to confirm that she knew where she was. Ex. 2 at 6-7.

In the home, officers located a loaded 9mm Glock handgun, various drug paraphernalia items, approximately 100 grams of Fentanyl, several Xanax pills, and over $7,000 in cash. Ex. 2 at 10-11; Def.'s Ex. 3 ("Ex. 3"), 1 (ECF No. 36-4, #118).

Lieutenant Gottardi asked Cowette to return to his police vehicle so he could advise her of the status of the search. Ex. 2 at 7. After Lieutenant Gottardi informed Cowette that officers had found 100 grams of Fentanyl and a large quantity of cash, Cowette stated that the small bag of Fentanyl was hers, but the remaining Fentanyl was Culver's property. Ex. 2 at 7; Def.'s Ex. 6 ("Ex. 6"), 3:58-4:24 (ECF No. 40). Lieutenant Gottardi then explained the charges against her. Ex. 2 at 7; Def.'s Ex. 7 ("Ex. 7"), 0:01-0:45 (ECF No. 40). Cowette once again reported seeing men in the woods. Ex. 2 at 7; Ex. 7 at 1:32-1:42.

Cowette exited Lieutenant Gottardi's vehicle and Detective David Cole transported Cowette to the Somerset County Jail. Ex. 1 at 11; Ex. 2 at 8. Before speaking with her, Detective Cole reminded Cowette of her *Miranda* rights and reiterated that she did not need to speak with him. Ex. 1 at 11; Def.'s Ex. 8 ("Ex. 8"), 0:46-1:04 (ECF No. 40). Nevertheless, Cowette continued to speak with Detective Cole and during the course of their ensuing conversation, she shared information regarding her personal drug use as well as information relating to Culver's drug trafficking. Ex. 1 at 11-12; Ex. 8 at 1:05-15:44.

The following day, July 17, 2018, Detective Cole met with Cowette in his office. Ex. 1 at 14. He reread Cowette's *Miranda* warnings in full. Ex. 1 at 14; Ex. 2 at 8; Def.'s Ex. 10 ("Ex. 10"), 0:41-1:09 (ECF No. 40). Cowette indicated she understood her rights pursuant to *Miranda* but wished to waive those rights and later signed a waiver to that effect. Gov't Ex. 1. During the conversation, Cowette provided officers with additional

5

information regarding Culver's drug trafficking activities as well as her involvement in those activities. Ex. 1 at 14-15, Ex. 2 at 8.

## DISCUSSION

In support of her motion to suppress, Defendant advances two primary arguments. First, she asserts that immediately after being read her *Miranda* rights in Lieutenant Gottardi's vehicle – at which point the parties agree she was in custody – she "invoked her right to counsel." Mot. Suppress, 8 (ECF No. 36, #82). Defendant then asserts the officers impermissibly reinitiated questioning four times and, as a result, her responsive statements should be suppressed. *Id.* at 11. In response, the Government asserts that the Defendant failed to "articulate her desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."[2] Gov't Resp., 5 (ECF No. 42, #133) (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)). In her reply, Defendant raises additional arguments, one of which is that the waiver of rights she signed on July 17, 2018, is invalid under *Maryland v. Shatzer*, 559 U.S. 98 (2010).[3] Def.'s Reply, 12 (ECF No. 43, #155).

---

[2] In the alternative, the Government advances two additional arguments. First, the Government asserts that even if Cowette had invoked her right to counsel, she later waived her right to counsel on three separate occasions: first when she initiated further communication with police by telling Lieutenant Gottardi that she would speak with him, second when she expressed a willingness to speak with Detective Cole en route to the Somerset County Jail, and third when she signed a form indicating she was waiving her rights. Gov't Response, 7, 9. Second, the Government asserts that even if Cowette did not waive her right to counsel, she made two unsolicited statements unconnected to any police interrogation and, therefore, those two statements must not be suppressed. *Id.* at 13. However, as the Government's first contention disposes of the inquiry, I do not address these arguments.

[3] Defendant also asserts that the two statements the Government asserts were "spontaneously made" were, in reality, the product of interrogation and must be suppressed. Def.'s Reply, 12-13. However, like the Government's additional arguments, the resolution of the parties' core contentions renders this argument irrelevant.

6

As established by the Supreme Court in *Miranda v. Arizona*, an individual subject to a custodial interrogation must be "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. 436, 444 (1966). An individual may waive her right to remain silent or right to counsel, and if that waiver is made voluntarily, knowingly and intelligently, then officers are free to question the individual and the statements made will be available for use by the prosecution in court. *Id.* If, however, an individual "clearly assert[s] his right to have counsel present during custodial interrogation," the officers "must immediately cease questioning [the] suspect" and may not reinitiate questioning "until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis*, 512 U.S. at 454, 458 (citing *Edwards v. Arizona*, 451 U.S. 477 (1981)); *see also Moran v. Burbine*, 475 U.S. 412, 433 n.4 (1986) ("'[T]he interrogation must cease until an attorney is present' *only* '[i]f the individual states that he wants an attorney.'" (quoting *Michigan v. Mosley*, 423 U.S. 96, 104 n. 10 (1975))).

With this elemental primer in mind, I turn to the parties' arguments, keeping in mind that the Government must bear the heavy burden of establishing that the statements made by Cowette were not in violation of her *Miranda* rights. *Miranda*, 384 U.S. at 475 ("This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst*, 304 U.S. 458 (1938), and we reassert these standards as applied to in custody interrogation.").

## I.  FAILURE TO INVOKE RIGHT TO COUNSEL

The Supreme Court's decision in *Davis v. United States* provides the test by which I must determine whether Cowette effectively invoked her right to counsel. *See Bui v. DiPaolo,* 170 F.3d 232, 239 (1st Cir. 1999) ("*Davis* applies to both components of *Miranda*: the right to counsel and the right to remain silent."). Emphasizing the need for effective law enforcement and the importance of facilitating legitimate police investigative activity, the *Davis* Court formulated an objective standard. *Davis*, 512 U.S. at 459, 460 (quoting *Mosley*, 423 U.S. at 102), 461. The Court instructed that in order to invoke *Miranda* rights, a suspect must express the desire to have an attorney present "sufficiently clearly" so that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id*. at 459. Unless the suspect's request "meet[s] the requisite level of clarity" – meaning that it is "unambiguous or unequivocal" – officers are not required to halt their interrogation.[4] *Id.* at 459, 462; *see also United States v. Oquendo-Rivas*, 750 F.3d 12, 19 (1st Cir. 2014) (requiring a suspect to "unequivocally demand assistance, request the lawyer's presence, or otherwise clearly indicate an unwillingness to make a statement absent presence of an attorney"). "[A] statement either is such an assertion of the right to counsel or it is not." *Smith v. Illinois*, 469 U.S. 91, 97–98 (1984) (brackets and internal quotation marks omitted); *see also Davis* 512 U.S. at 459.

---

[4] In *Davis,* the Supreme Court acknowledged that the requirement of a "clear assertion of the right to counsel might disadvantage some suspects who – because of fear, intimidation, lack of linguistic skills, or a variety of other reasons – will not clearly articulate their right to counsel although they actually want to have a lawyer present." *Davis*, 512 U.S. at 460. Nevertheless, the standard remains: "after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Id.* at 461.

8

*Davis* concluded that the defendant's statement, "Maybe I should talk to a lawyer," was too ambiguous to qualify as a request for counsel. *Davis*, 512 U.S. at 462. Likewise, in *United States v. Nolan,* the Ninth Circuit panel affirmed a district court's determination that, in context, the defendant's "mid-interview statement that 'I guess I have to, you know, get a lawyer or something because we're not coming to an understanding here'" did not qualify as an unequivocal request for counsel. 443 F. App'x 259, 260 (9th Cir. Jul. 15, 2011). Other jurists have come to the same conclusion when faced with similarly vague language. *See, e.g., Luna v. Lamarque*, 400 F. App'x 169, 172 (9th Cir. 2010) (affirming that the defendant's statement, "I should probably get a lawyer, I guess," was an "unsuccessful invocation[] of his right to counsel," but concluding that his later statement, "[I]t sounds like I need a lawyer. And I need help" sufficiently invoked his right to counsel); *Sechrest v. Ignacio,* 549 F.3d 789, 807 (9th Cir. 2008) ("We have also held that the statements, 'I think I would like to talk to a lawyer,' and, 'maybe [I] ought to see an attorney' were not clear and unambiguous requests for counsel." (citations omitted)); *Fraher v. Patrick*, No. 06-CV-1406, 2010 WL 532397, at *16 - 17 (C.D. Cal. Feb. 9, 2010) (habeas petition) (concluding that the defendant's statement: "Yes, I would like attorney I guess" which, after the officer sought clarification, was then followed by "[w]ell I'll tell you what I know" fell short of invoking the defendant's right to counsel and did not require "cessation of questioning"); *United States v. Mees*, No. 4:09-CR-00145, 2009 WL 1657420, at *9 (E.D. Mo. June 10, 2009) (concluding the defendant's statements, "Then I guess I'm just gonna wait until I get a lawyer and I don't know what else (inaudible)[,]" and "I guess I need to wait and talk to a lawyer[,]" did not qualify as an unambiguous,

9

unequivocal invocation of his *Miranda* rights)); *Taylor v. State*, 689 N.E.2d 699, 703 (Ind. 1997) ("[The defendant's] statement of 'I guess I really want a lawyer, but, I mean, I've never done this before so I don't know' is an expression of doubt, not a request. A reasonable police officer in the circumstances would not understand that [the defendant] was unambiguously asserting his right to have counsel present.").

The indecisive language utilized by Cowette was too ambiguous or equivocal to invoke her *Miranda* rights. *Davis*, 512 U.S. at 459. After Lieutenant Gottardi read Cowette her rights[5] and asked whether she wished to speak with him, Cowette responded while shrugging her shoulders: "I guess I should probably wait until I have a lawyer, that sounds like the best idea, I don't – I've never been in Court, never been in trouble, I don't – … I guess not, I guess I'll wait until I have a lawyer." Ex. 2 at 5-6; Ex. 4 at 3:35-3:52. Like the Government and other post-*Davis* courts scrutinizing similarly equivocal language, I focus on the qualifier "I guess." Gov't. Resp., 5-6; *see also Mees*, No. 4:09-CR-00145, 2009 WL 1657420, at *21 (E.D. Mo., Noce, M.J.) ("[W]hen a defendant mentions counsel, but prefaces those remarks with the statement "I guess," courts have been reluctant to find such a statement to be a clear invocation of the right to counsel."). Cowette used this phrase three times in her response and its inclusion renders ambiguous what would otherwise, in its absence, be an unambiguous statement ("I'll wait until I have a lawyer").

In rebuttal, Defendant asserts that "prefacing the invocation with 'I guess' did not make [her] invocation ambiguous." Reply, 5. To support this argument, Defendant relies on a 2007 First Circuit case in which the court seemingly accepted without analysis that

---

[5] Importantly, Defendant does not contend that the *Miranda* warnings provided were deficient.

the defendant's statement "I think I'm going to get a lawyer" qualified as an invocation of his right to counsel. *United States v. Teleguz*, 492 F.3d 80, 88 (1st Cir. 2007). This argument is an exemplar of "any port in a storm." In *Teleguz*, the testimonial evidence the defendant sought to suppress was made *prior to* the defendant's statement that he thought he would get a lawyer; therefore, the First Circuit determined "his right to counsel [wa]s not at issue." *Id.* Consequently, *Teleguz* does not support Defendant's argument. Other First Circuit precedent is more useful and contradicts Defendant's position. *See, e.g., United States v. Sweeney*, 887 F.3d 529, 535-36 (1st Cir.), *cert. denied*, 139 S. Ct. 322, 202 L. Ed. 2d 226 (2018) (indicating that the defendant "create[d] ambiguity as to whether he was invoking his right to counsel" when he stated "I'm trying to keep myself—I don't want to dig a hole. I need to speak to a lawyer" but immediately continued, without prompting, to talk and then queried "[d]o I need a lawyer?"; concluding that until the defendant stated "I'm screwed. I need a lawyer," he failed to unambiguously request counsel).

In analyzing the shortcomings of Cowette's request for counsel, I am mindful of the Supreme Court's guidance that a defendant's words should be "understood as ordinary people would understand them." *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987). The argument that the phrase "I guess" is so ubiquitous as to have little impact on the meaning of a statement in which it is incorporated is chillingly Orwellian. Mr. Orwell famously observed that thoughts may corrupt language and language can corrupt thought. In a similar vein, Orwell posited that the "slovenliness of our language" makes it easier for us to have disorderly thoughts. George Orwell, *Politics and the English Language* (1946). Among the many benefits of giving plain language its ordinary meaning is that we

geometrically enhance our prospects of shared understanding. This strikes me as particularly critical in the application of constitutional protections. I acknowledge that the declarative sentence is an endangered species. But to relegate the equivocation "I guess" to the lowly status of a meaningless throat clearer and polite introduction to an otherwise clear declaration is a lexicographical bridge too far.

Accordingly, Judge Singal adopted Magistrate Judge Rich's conclusion that a defendant had not "unambiguously invoke[d] either his right to counsel or his right to cease questioning" because his "use of the phrase, 'I guess,' twice, spoken while lowering his voice, conveyed uncertainty." *United States v. Clark*, 746 F. Supp. 2d 176, 185 (D. Me. 2010). In coming to this conclusion, Magistrate Judge Rich expressly rejected the defendant's argument that "in common parlance, the use of the phrase 'I guess' does not undermine a declarative sentence." *Id.* Likewise, the Eighth Circuit applied the *Davis* standard to the defendant's statement: "I guess you better get me a lawyer then" and concluded that this statement did not qualify as an "unequivocal or unambiguous request for counsel." *United States v. Havlik*, 710 F.3d 818, 822 (8th Cir. 2013). The Eighth Circuit reasoned:

> The phrase "I guess" is "used to indicate that although one thinks or supposes something, it is without any great conviction or strength of feeling." *The New Oxford American Dictionary* 755 (Elizabeth J. Jewell & Frank Abate, eds. 2001). As a transitive verb, to "guess" means to "estimate or suppose (something) without sufficient information to be sure of being correct." *Id.* In other contexts, the phrase "I guess" has been viewed as equivocal. *E.g., Culkin v. Purkett*, 45 F.3d 1229, 1233 (8th Cir. 1995) (describing a witness's "I guess" response to a court's question as "equivocal"); *United States v. Nelson*, 450 F.3d 1201, 1212 (10th Cir. 2006) (describing the phrase "I guess I'm ready to go to jail then" as "at best an ambiguous or equivocal statement" in applying *Davis* to an alleged invocation of the

12

> right to remain silent); *United States v. Wiggins*, 131 F.3d 1440, 1442 (11th Cir. 1997) (describing the phrase "I plead guilty I guess" as "equivocal"); *cf. Burket v. Angelone*, 208 F.3d 172, 197–98 (4th Cir. 2000) (concluding that "I think I need a lawyer" is not an unequivocal request for counsel). [The defendant's] statement is thus not materially different from the statement "[m]aybe I should talk to a lawyer," which the Supreme Court held ambiguous in *Davis*, 512 U.S. at 462.

*Id.* I find persuasive the Eighth Circuit's fulsome analysis and fidelity to plain language and likewise conclude that when considered in full, Cowette's statement would have led a reasonable officer to believe – at most – that she "*might* be invoking the right to counsel." *Davis*, 512 U.S. at 459.

Because Cowette failed to invoke her right to counsel, Lieutenant Gottardi was not required to halt the interrogation. *Id.* at 462 ("Unless the suspect actually requests an attorney, questioning may continue."); *see also Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010) ("[A]fter giving a *Miranda* warning, police may interrogate a suspect who has neither invoked nor waived his or her *Miranda* rights."). This is so even though Lieutenant Gottardi initially suspended questioning.[6] For purposes of the objective, "bright line"

---

[6] The *Davis* Court noted that in the case of an ambiguous or equivocal statement, "it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." *Davis*, 512 U.S. at 461. The Court reasoned: "Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel." *Id.* However, while clarification of a defendant's statement is advisable, it is not required. *Id.*; *see also Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) ("[T]he police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his or her Miranda rights." (internal citations omitted)). Interestingly enough, when law enforcement officers sought to clarify whether or not Cowette wished to waive her rights under *Miranda*, on one occasion she explicitly responded in the affirmative by stating that "she would talk now" and, on other occasions, by forging ahead with her statements.

inquiry,[7] Lieutenant Gottardi's subjective interpretation of or reaction to Cowette's statement is immaterial and his choice to cease questioning Cowette does not preclude interrogation at a later point. *See Davis*, 512 U.S. at 461-62.

In the absence of an "unambiguous or unequivocal request for counsel,"[8] Cowette's statements regarding her involvement with Culver, her personal drug habits, the ownership of the items recovered in her home, and the combination to the safes – whether unsolicited or in response to questions posed by officers – shall not be suppressed.

## II. KNOWING & INTELLIGENT WAIVER

Counsel for Cowette briefly called into question her state of mind during her initial interactions with officers; presumably for the purpose of contesting whether Cowette acted "voluntarily, knowingly and intelligently" when she failed to invoke her right to counsel

---

[7] The Supreme Court reasoned:

> The *Edwards* rule—questioning must cease if the suspect asks for a lawyer—provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. But if we were to require questioning to cease if a suspect makes a statement that *might* be a request for an attorney, this clarity and ease of application would be lost. Police officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong.

*Davis*, 512 U.S. at 461.

[8] Defendant does not argue, and the record does not support, that she made a request for counsel during the subsequent conversations between herself and law enforcement officers. To the contrary, the record reflects that she initiated conversations between herself and officers on multiple occasions, *see Davis*, 512 U.S. at 458, and even expressly waived her rights under *Miranda* on two occasions: first when she stated "she would talk now" and second, when she signed the *Miranda* waiver form. During her interactions with officers, Cowette was read her *Miranda* rights in full twice and reminded of the contours of those rights on at least two other occasions. The protective measures employed by the officers at the scene provided ample opportunities for Cowette to re-evaluate the merits as well as the risks of cooperating with them. *See Berghuis*, 560 U.S. at 388 ("As questioning commences and then continues, the suspect has the opportunity to consider the choices he or she faces and to make a more informed decision, either to insist on silence or to cooperate. When the suspect knows that *Miranda* rights can be invoked at any time, he or she has the opportunity to reassess his or her immediate and long-term interests."). Nevertheless, despite being informed of these risks, Cowette continued to engage with officers and provide incriminating information.

and subsequently provided law enforcement officers with incriminating information. *Miranda*, 384 U.S. at 444. This argument appears to have been an afterthought and was not developed. Perhaps this was a strategic decision for appeal purposes; it is not clear. I will respond in kind and provide a deserving summary analysis, focusing on whether Cowette's waiver was "knowing and intelligent." *Burbine*, 475 U.S. at 421 ("Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979))).

An express waiver is not required and a waiver – whether express or implied – meets the requisite level of comprehension when it was "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Garcia*, 983 F.2d 1160, 1169 (1st Cir. 1993); *see also North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("[I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated."). This means Cowette must have understood that "[s]he had the right to remain silent and that anything [s]he said could be used as evidence against [her]." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). Therefore, faithful delivery of *Miranda* warnings "ensure[s] that a waiver of these rights is knowing and intelligent." *Id.* ("The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege.").

While Cowette's mental clarity was understandably a point of concern for officers at the scene due to her apparent hallucinations, she was read her *Miranda* rights (after

15

which she verbally confirmed she understood those rights) and she was repeatedly reminded of those rights throughout her interactions with the officers. Furthermore, Cowette demonstrated her mental acuity when she denied recent drug use (other than ZQuil), "rapidly and correctly" confirmed her name and date of birth, and expressed an awareness of where she was. As noted by officers, on the whole, Cowette was "coherent and walked, talked, and acted in a normal manner." Ex. 2 at 5. Therefore, the record does not support the conclusion that Cowette failed to understand the basic principles protected by the Fifth Amendment or the "consequences of speaking freely to the law enforcement officials." *Spring*, 479 U.S. at 575. Cowette was properly informed of her rights and her waiver of those rights was "made knowingly and intelligently within the meaning of *Miranda*." *Id.; see also Burbine*, 475 U.S. at 422–423 ("Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.").

### III. WRITTEN WAIVER

Defendant asserts that her July 17, 2018 waiver was invalid under *Maryland v. Shatzer*, 559 U.S. 98 (2010) because she "was still in custody from her arrest the prior day, never provided counsel as she requested, and no break of the 14-day rule in *Shatzer* occurred." Reply, 12. This argument is of no avail.

In *Shatzer*, the Supreme Court "consider[ed] whether a break in custody ends the presumption of involuntariness established in *Edwards v. Arizona*, 451 U.S. 477 (1981)."

559 U.S. at 100. Relying on the belief that a sufficient break in custody "provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody," *id.* at 110, the Court adopted "a bright-line rule that if a suspect who has invoked his right to have counsel present during a custodial interrogation is released from police custody for a period of fourteen days before being questioned again in custody, then the *Edwards* presumption of involuntariness will not apply," *United States v. Guzman*, 603 F.3d 99, 105 (1st Cir. 2010). Because Cowette failed to unambiguously assert her right to counsel during her interactions with law enforcement officers on July 16 or 17, she cannot invoke the presumption of involuntariness afforded under *Edwards* and *Shatzer*.

## CONCLUSION

For the reasons discussed above, Defendant's Motion to Suppress (ECF No. 36) is **DENIED**.

**SO ORDERED.**

Dated this 13th day of August, 2019

/s/ Lance E. Walker
**LANCE E. WALKER**
**UNITED STATES DISTRICT JUDGE**